# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 20, 2012 Session

## STATE OF TENNESSEE v. DEMANCE BEASLEY

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2018      Monte Watkins, Judge**

_____

**No. M2011-00228-CCA-R3-CD - Filed June 6, 2012**

_____

A Davidson County jury convicted the Defendant, Demance Beasley, of first degree felony murder, aggravated assault, and possession of .5 grams or more of cocaine with the intent to sell or deliver. The trial court sentenced the Defendant to an effective sentence of life in the Tennessee Department of Correction. On appeal, the Defendant asserts that the evidence is insufficient to sustain his conviction for felony murder because the State's witnesses provided inconsistent testimony and were not credible. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Michael Meise (on appeal), Dickson, Tennessee, and Richard Tennent (at trial), Nashville, Tennessee, for the appellant, Demance Beasley.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Roger Moore and Deborah Housel, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from a shooting that occurred during a drug transaction in a

residential area in Davidson County, which resulted in the aggravated assault of Antwaun Jordan and the first degree felony murder of Sherry Bond ("victim"). Relating to these events, a Davidson County grand jury indicted the Defendant for first degree felony murder, premeditated first degree murder, aggravated assault, and possession of 0.5 grams or more of cocaine with intent to sell or deliver. At trial, the parties presented the following evidence: Jordan testified that he lived "across the yard" from the victim in a housing development located on Blank Street in Nashville, Tennessee. Jordan said that he knew the Defendant, explaining that the Defendant's brother was married to Jordan's cousin, Lencoya Felts. Jordan recalled that on January 5, 2007, as he was leaving his home, the Defendant drove up and asked Jordan where he could purchase drugs. Jordan took the Defendant and the Defendant's "little brother" to the victim's apartment to meet with her son, Charles Bond, who lived with her. Jordan stood outside the porch while the Defendant stood on the porch with Bond. Bond showed the Defendant the drugs, and the Defendant pulled a gun from his pocket and told Bond to "give him everything he got." Bond handed the drugs to the Defendant. Jordan said that he intervened, calling the Defendant by name and stating "you can't be robbing people like that." The Defendant turned around and told Jordan "we don't say no names around here," and then fired his gun. Jordan said that he did not realize that he had been shot until Bond said to Jordan, "damn, brother, he shot you."

Jordan testified that he looked down at his leg to see his "whole pant leg was red." Jordan said that once the Defendant returned his attention to Bond, Jordan "hopped" across the courtyard and around the building to the back door of his cousin's apartment. Jordan knocked on the door and then heard two more gunshots. He lay down on his cousin's porch, assuming that the Defendant would "come around to finish [him] off." Jordan said he later awoke while being transported to the hospital in an ambulance.

Jordan testified that police officers spoke with him at the hospital while medical personnel treated the gunshot wound to his leg. Jordan said that he initially told the police that his name was "Antwaun Mitchell," in order to avoid arrest for an outstanding warrant. Later, after leaving the hospital, Jordan identified the Defendant as the shooter in a photographic line-up. The State offered the photographic line-up with Jordan's identification of the Defendant into evidence.

Jordan identified photographs of the blood trail he left as he "hopped" to the back door of his cousin's home and his clothing worn during the shooting. Jordan denied having a gun at the time of the shooting. Jordan also testified that he did not see either Bond or the Defendant's brother with a gun.

On cross-examination, Jordan agreed that, when interviewed by Officer Pearsall, he did not mention the drug deal. Jordan explained that he did not mention the drug deal to

avoid "trouble." Jordan denied telling Officer Pearsall that there were two gunshots and then a third gunshot that struck his leg. Jordan admitted to using "$10 worth" of cocaine on January 5, 2007.

Lencoya Mitchell Felts testified that Antwaun Jordan was her first cousin, and the Defendant was her husband's brother. She recalled that on January 5, 2007, she was at home with her husband, Alery Felts, and their children. Felts said that she and her husband were watching television when she heard three gunshots. She ran out the back door to look in the alley. She returned inside and then heard another gunshot. After hearing the single gunshot, Jordan banged on her back door and told her he was shot. Felts asked Jordan who shot him, and he told her that the Defendant shot him. Felts said that she refused to allow Jordan to enter the house out of fear for her children's safety. Felts heard two more gunshots after talking with Jordan.

On cross-examination, Felts agreed that she lied to police about Jordan's last name to prevent him from being arrested on an outstanding warrant. She explained that "he was hurt and didn't need to go to jail right then and there." Felts confirmed that she heard six gunshots that night: three in the alley "when they was shooting up in the air" and three from the front of her building.

Chasity Howse, who was dating Bond at the time of the shooting, testified that on January 5, 2007, her cousin dropped her off at 3:45 p.m. at the victim's apartment where Bond was staying, and she remained there for the evening. At approximately 8:00 p.m., Bond answered a knock at the door and stepped outside. An argument ensued, and Howse heard one of the men at the door say, "give it up." The victim walked into the living room, looked out the front door, and then began screaming "they're robbing him, I'm calling police!" The victim ran toward her room to call police when a bullet came through the front window and struck her in the back. She fell to the floor in front of Howse, and Howse slid to the floor and tried to comfort her until the ambulance arrived. Howse said that she spoke to police after the shooting and lied about her name because she was sixteen years old at the time and her sister had forbidden her from going to Bond's apartment. Howse said that, other than her name, she told police the truth about the shooting. Howse said that she did not see Bond with a gun that night.

Bond testified that he was in custody at the time of the trial for a drug possession charge and had pending felony drug charges. Bond agreed that he had previously been convicted of two felony drug charges. Bond said that he was testifying "because a guy killed my mother" and not because there were any promises made to him in exchange for his testimony.

3

Bond testified that the last time he saw the victim was January 6, 2007. He said that, at the time of the shooting, he was staying at the victim's house because she helped him change the bandages on two gunshot wounds he had sustained. Bond said that the gunshot wounds were on his leg, requiring him to use a crutch to walk. On the evening of January 5, 2007, Bond, the victim, and Howse were at the victim's residence. Bond recalled that, while he and Howse were watching a movie in the living room, the victim was in her bedroom. At around 10:00 p.m., Jordan knocked on the door of the apartment and Bond answered the door. Bond stepped outside, and Jordan told him that "his cousin" wanted to buy drugs. Bond did not know Jordan's "cousin," but he agreed to sell two grams for $150. Jordan went to convey the offer to his cousin, and Bond went back inside.

Bond testified that Jordan again knocked on the door several minutes later, and Bond went outside onto the porch. Bond described Jordan as standing on the ground off to the right of the porch. Bond watched as the Defendant and another man exited a white four-door car and walked up to the porch. Bond testified that he was holding the drugs in his right hand when the Defendant pulled a gun from his jacket pocket and pointed it at Bond. Bond described the Defendant as "an arm length" away from him. Bond said he did not respond when the Defendant pointed the gun at him but that Jordan told the Defendant "no" and said a name that Bond could not fully hear. The Defendant told Jordan not to use the Defendant's name, took "like two or three steps," and shot Jordan. Jordan "started hollering and hopped off."

Bond testified that the Defendant again pointed the gun at Bond and ordered Bond to "give me everything you got." Bond opened his hand and the Defendant took the drugs and then he repeated his demand. Bond told the Defendant that he did not have anything else. Bond said that he heard the victim inside the house, yelling that she was going to call the police. The Defendant turned to walk off the porch and Bond went inside the house. Within a "couple of seconds" two gunshots came through the front window. The victim said that she was shot and then fell to her knees on the floor and rolled over onto her back.

Bond said that, at the time, he felt "[m]ad, upset, angry" and was in "shock." Bond called 911 while Howse held the victim's hand. Bond said that he handed the phone with the 911 operator still on the line to Howse, and he walked to the victim's closet and retrieved a shotgun. Bond said that he went outside with the shotgun where he saw the Defendant driving off in the white car. Bond tried to fire the shotgun at the Defendant, but the safety was engaged on the shotgun, preventing him from shooting. Bond said he returned inside the house and placed the shotgun back in the victim's closet.

Bond testified that he then waited with the victim until the ambulance arrived. After the victim was transported to the hospital, police officers questioned Bond about the

4

shooting. Bond said that he did not tell the police officers the entire story because he wanted "to handle the situation [him]self." After a period of questioning, one police officer told Bond that he needed to tell the truth and let the police handle the situation rather than seek his own revenge. Bond said, at that point, he began telling police officers about the robbery but excluded the drug sale and the shotgun because he "didn't want to get in trouble." Five or six days after the shooting, Bond again met with police officers and told them the entirety of the events, including the drug sale.

Bond identified the photographic line-up from which he positively identified the Defendant as the shooter. Bond testified that he did not see anyone other than the Defendant with a gun that night.

Keith Holley, a Metropolitan Nashville Police Department officer, testified that on January 5, 2007, he reported to a shooting scene on Blank Street in a residential area of Nashville, Tennessee. When he arrived on the scene, he learned two people had been shot: Jordan and the victim. Officer Holley said that he proceeded into one of the apartments where he found the victim lying on her back on the floor and Bond and Howse sitting on the couch. The victim was conscious, but she appeared to be in pain and having difficulty breathing. Initially, Officer Holley did not see any blood. After some inspection, he saw a "small puncture wound in the area of her right shoulder blade and her back." He said that he believed the wound to be consistent with a gunshot wound.

Officer Holley testified that after ambulance personnel arrived and took over the victim's care, he began looking for evidence. Officer Holley described Howse as "shaken" and Bond as "very quiet." Police officers quickly determined that the shooting occurred outside the residence. Officer Holley observed a hole in a curtain hung on the front window. Upon further inspection, he found two separate bullet holes in the front window.

Paul Junkmann, a Metropolitan Nashville Police Department officer, testified that he responded to a shooting call on the night of January 5, 2007. When he arrived, people on the scene indicated the location of a victim. Officer Junkmann said that he found Jordan lying on his back outside the door of an apartment. He said that Jordan had a gunshot wound on the lower half of his left leg. Officer Junkmann described Jordan as conscious and in extreme pain. Upon questioning, Jordan told the officer that the Defendant, a black man in his 20's, shot him. Jordan told Officer Junkmann that a younger black man was with the Defendant at the time of the shooting. Jordan provided the officer with his birth date and said that his name was "Antwaun Mitchell." Officer Junkmann said that he inspected the blood trail that led from the courtyard around to the back of the apartment and up the stairs to where Jordan had been lying. Officer Junkmann said that he did not find any weapons along that path or on Jordan.

5

On cross-examination, Officer Junkmann testified that he later learned that the name and birth date Jordan provided were false.

Warren Fleak, a Metropolitan Nashville Police Department crime scene investigator, testified that on January 5, 2007, he reported to a shooting scene on Blank Street in a residential area of Nashville, Tennessee. Officer Fleak identified a crime scene diagram that depicted where various items of evidence were recovered at the scene of the shooting. Officer Fleak explained that, when he arrived at the scene, police officers appeared to be conducting interviews inside the residence where the shooting occurred, so he began work on the exterior of the building. Officer Fleak identified photographs of three Remington Peter .9 millimeter cartridge casings and three Remington Peter .45 caliber cartridge casings found at the scene. Officer Fleak testified that he also photographed two projectile strikes in the window of the residence.

Officer Fleak testified that he then investigated the inside of the apartment. Based on his investigation of the projectile strikes in the window of the residence, Officer Fleak was able to determine that the shooter was not standing directly in front of the window but was "further back" and "shot upward into the window." Officer Fleak described the area as having a "courtyard" entrance and approximately eight stairs leading up to the apartment where the shooting occurred. Officer Fleak testified that a projectile fragment was photographed and recovered from the middle of the floor in the apartment.

Officer Fleak testified that he finished his investigation and left the scene at approximately 2:00 a.m. but was called back at 4:50 a.m. When he arrived, he observed and photographed a white Ford four-door vehicle. Officer Fleak said that a Ruger .45 caliber semi-automatic pistol was taken from the victim. A Lorsen .25 caliber semi-automatic pistol was found inside the vehicle.

James Pearsal, a Metropolitan Nashville Police Department officer, testified that on January 5, 2007, he was dispatched to Vanderbilt Hospital in connection with two victims involved in a shooting. Upon his arrival, he learned that one victim was deceased, and the other victim, Jordan, who he believed was named "Antwaun Mitchell," was in the trauma unit of the emergency room receiving treatment for a gunshot wound to his leg. Officer Pearsal said that Jordan appeared to be in pain, but he was unaware of whether medical personnel had administered pain medication. Officer Pearsal explained that because Jordan was being medically treated, he spoke to Jordan in "spurts" so as not to be in a doctor's way. While speaking with Jordan, Officer Pearsal took notes and then went to his police car and wrote out his supplemental report. Officer Pearsal said that he did not write "verbatim" what Jordan said but tried "to get the basic story." Officer Pearsal testified that Jordan told him that he heard two gun shots, began to run, and then saw two black men run past him. He then

6

heard one gunshot, realized he had been shot in the leg, and went to his cousin's apartment.

Officer Pearsal testified that, after leaving the hospital, a description of the suspect's car was released. Officer Pearsal recognized the description of the vehicle as one he had stopped two weeks earlier, issuing a traffic citation to the Defendant. As Officer Pearsal was patrolling, he saw the vehicle pull onto Blank Street and stop. Officer Pearsal, along with two other officers, pulled in behind the Defendant. The Defendant exited his vehicle and stood outside his vehicle with his hands in the air. The Defendant told the police officers that he had a gun in his pocket because he was shot at earlier. Officer Pearsal retrieved a .45 caliber gun, with the serial number scratched off, from the Defendant's front pocket. The gun was loaded with six live rounds. Officer Pearsal also found a substance which field-tested positive for crack cocaine in the Defendant's pocket. A search of the Defendant's vehicle incident to his arrest revealed a loaded Larsen .25 caliber pistol under the passenger seat. The Defendant denied knowledge of the Larsen .25 caliber pistol.

The State entered a stipulation that the substance found in the Defendant's pocket was confirmed by testing to be cocaine, a schedule II drug, and that it weighed 2.3 grams.

Dr. Amy R. McMaster testified as an expert in the field of forensic pathology. Dr. McMaster testified that although she did not conduct the autopsy, she had reviewed the autopsy report, diagrams, photographs, toxicology and the report of investigation. Dr. McMaster testified that the victim had an entrance wound to her right upper back. The bullet traveled from the back to front and right to left, injuring the skeletal muscle, rib and the left lung. The bullet was recovered from the victim's left chest wall. Dr. McMaster testified the victim's cause of death was a gunshot wound to the back, and the manner of death was homicide.

James Arrendall, a Metropolitan Nashville Police Department officer, testified that he collected a bullet from the Medical Examiner's Office, which had been removed from the victim's body.

David Haywood, a Metropolitan Nashville Police Department officer, testified that he was one of the detectives assigned to the Blank Street shooting. During the course of the investigation, the Defendant's name was developed as a suspect. Detective Haywood said that he observed the interview of Bond and the Defendant. During the course of Bond's interview, Detective Haywood asked the other officers to step out, and he told Bond that he did not believe he was being truthful. The detective said that he believed Bond wanted to seek revenge for the shooting of the victim, and, as a result, he was withholding information from the police.

Approximately five or six hours after the shooting, Detective Haywood interviewed the Defendant. The Defendant signed a waiver of rights form, and the interview was recorded. The recording of the interview was played for the jury. On the recording, the Defendant initially denied being present at Blank Street or having any knowledge of the shooting. As the interview progressed, the Defendant admitted he had been on Blank Street to buy drugs to re-sell for money to post bond for his girlfriend who had been arrested. He maintained that he did not know Antwuan Jordan. The Defendant recalled that he stood on the porch with a man with a crutch who had the cocaine and another man stood off to the side of the porch. The Defendant told the detectives that the man standing on the side of the porch was the first to display a gun. The Defendant speculated that it was "a set-up from the first jump." The Defendant admitted that he shot to scare "somebody" and to protect himself from being robbed. He said that "bullets going through windows" and someone being shot in the back "wasn't never intended to happen." The Defendant said he shot three times as he ran and did not know he had hit anyone. The Defendant then got in his car and fled. The Defendant said that Horace Williamson, who was with him, played no role in the shooting and did not fire a gun. The Defendant maintained that the only two people with guns were Jordan and the Defendant, and the Defendant said that he was the only one who fired a gun.

Robert Royse, a Tennessee Bureau of Investigation forensic scientist, testified that he was provided with the Ruger .45 caliber pistol that police officers recovered from the Defendant's pocket. After testing, Agent Royse confirmed that the cartridge casings found at the scene and the bullet retrieved from the victim's chest wall were all fired from the Ruger .45 caliber pistol.

The State and the Defendant agreed that Horace Williamson was unavailable as a witness. The State played Williamson's video recorded testimony from a previous hearing. Williamson testified that he was sixteen years old at the time of the trial and fifteen years old at the time of the shooting. Williamson said that he was with the Defendant the night of the shooting and fired a .25 caliber pistol twice while the Defendant only shot into the air one time. Williamson said that Jordan began shooting and so Williamson fired his gun to protect the Defendant. Williamson could not describe the gun he fired that night, although he said it was his gun. He could not describe the Defendant's car in which the two men rode that night. Williamson testified that he was unaware that the bullet recovered from the victim's body matched the Defendant's gun.

The Defense called Beth Halstead, an employee of the Davidson County Criminal Court Clerk's office, as a witness. Halstead testified that Tanisha Pendergrass, the Defendant's girlfriend, was arrested on January 5, 2007. The bond amount set for Pendergrass was $11,000.

Based upon this evidence, the jury convicted the Defendant of first degree felony murder, aggravated assault, and possession of .5 grams or more of cocaine with the intent to sell or deliver. The trial court ordered the Defendant to concurrent sentences of life in prison for the first degree felony murder conviction, six years for the aggravated assault conviction and twelve years for the possession of .5 grams or more of cocaine with the intent to sell or deliver conviction. It is from this judgment that the Defendant now appeals.

## II. Analysis

The Defendant argues that the evidence presented at trial is insufficient to support a finding that he is guilty of first degree felony murder. He contends that the inconsistencies and inaccuracies in witnesses' testimony leave the conviction unsupported. The State responds that the proof supports the jury's finding that the Defendant is guilty of felony murder. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'"

*State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was convicted of first degree felony murder in the perpetration of a robbery, which requires proof beyond a reasonable doubt that the Defendant killed the victim during the perpetration of or attempt to perpetrate a robbery. *See* T.C.A. § 39-13-202(a)(2) (2010). The mental state required for the conviction is whether the Defendant possessed the intent to commit the underlying offense, which in this case was a robbery. Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear ." T.C.A. §§ 39-13-202(a)(2), -202(b) (2010), and 39-13-401(a) (2010).

The evidence, viewed in the light most favorable to the State, proves that the Defendant was on the victim's apartment porch with the victim's son, Bond. During the course of a drug transaction, the Defendant removed a pistol from his front pocket and demanded "everything" from Bond. Bond turned over the crack cocaine he planned to sell to the Defendant. When Jordan attempted to intervene, calling the Defendant by name, the Defendant admonished Jordan for using his name and shot Jordan in the leg. The victim, who was inside the apartment, looked out the front door and began to yell that she was going to call the police. The Defendant fired two shots into the apartment, one of which struck and killed the victim, and fled the scene. Later that same night, the Defendant was taken into custody and a Ruger .45 caliber pistol was found in his front pocket. The Defendant admitted to police that he fired his gun, and forensic evidence indicated that the bullet retrieved from the victim's body was fired from the Defendant's gun. The evidence shows

that, during the course of perpetrating or attempting to perpetrate a robbery, the Defendant shot and killed the victim. Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's conviction for first degree felony murder.

The Defendant claims that the witnesses' testimony was "inconsistent," and he attacks the credibility of the State's witnesses. The Defendant refers to several inconsistencies between the testimony of various witnesses and the fact that Bond, Jordan, Howse, and Felts all lied to the police at some point in the investigation of the shooting. We note that it is the jury's prerogative to evaluate and weigh the evidence. Any alleged inconsistent statements and credibility issues were brought out on direct and/or cross-examination. The weight and credibility of the testimony of a witness and the reconciliation of conflicts in testimony, if any, are matters entrusted exclusively to the jury. By its verdict, the jury exercised its prerogative and chose to accredit the testimony of the State's witnesses. It is the jury who is charged with making credibility determinations, not this Court. *Smith*, 24 S.W.3d at 278. It is not the function of this Court to reweigh the credibility of witnesses on appeal. *Id*. at 278-79. There was sufficient evidence to support a jury finding that the Defendant committed first degree felony murder. We will not disturb their decision. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE